NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| OMNI CREDIT ALLIANCE, INC., | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 04-4764 (PGS) |
| v. | : | |
| KENNEDY FUNDING, INC., JOSEPH WOLFER, JEFFREY WOLFER, | : | |
| Defendants/Third-Party Plaintiffs, | : | OPINION |
| v. | : | |
| KENNETH REAVES, | : | |
| Third-Party Defendant. | : | |

SHERIDAN, U.S.D.J.

This matter was tried before the Court on September 10 and 11, 2007. The Court considered all documents submitted into evidence, the testimony of the witnesses and the briefs of the parties.

Kennedy Funding (Kennedy) and Omni Credit (Omni) entered into a Loan Commitment Agreement (LCA) wherein Kennedy agreed to loan Omni $25 million at 15 percent per annum interest for 18 months. In order to secure the loan commitment, Omni paid an application fee of $10,000.00 to Kennedy in July 2002, and another $250,000.00 on November 14, 2002 as partial payment of a commitment fee in the amount of $750,000. Since the loan never closed, Omni seeks

return of its $260,000 while Kennedy believes it is owed the balance ($500,000) due on the $750,000 commitment fee[1].

I.

In a non-jury case, the Court sits as the trier of fact and law. As such, the Court assesses the credibility of witnesses and deduces facts from direct and circumstantial evidence. Like a jury, the Court determines the trustworthiness of testimony by assessing the demeanor of the witnesses and whether their statements were honest and forthright. In this case, testimony of the witnesses was evaluated by employing the same factors as a jury is instructed to use. Third Circuit Model Jury Charges §1.7. *Utilities, Inc. v. Blue Mountain Lake Assc.*, 121 Fed. Appx. 947, No. 04-1617 (3d Cir. 2005). There were only three witnesses presented at trial: Jeffrey Wolfer (Wolfer), Kenneth Reaves (Reaves) and Matthew Cole (Cole). With regard to their credibility, the Court makes the following assessment.

Wolfer, President of Kennedy was not a credible witness. He answered many questions evasively. At times, he was argumentative. Some of his testimony did not comport with common sense, and some answers contradicted others. For example, Wolfer waivered on the nature of his role in the transaction. The Court recalls that Wolfer initially testified that he was the primary contact with Omni throughout the transaction; but on cross examination, Wolfer acknowledged that Cole took charge during the crucial portions of the negotiations in November 2002, as well as for a period of time prior to execution of the LCA when the transaction terms were negotiated.

---

[1] These commitment fees have been the source of much litigation. For example, *National Integrity Development, Inc. v. Kennedy Funding, Superior Court of New Jersey, Law Division, Docket No. BER-L-10489-97;Kennedy, Inc. v. Lion's Gate Development*, 2006 WL 2786927 No. 05-4741 (D.N.J. September 26, 2006); *Kennedy, Inc. v. Ruggers Acquisition*, 2007 WL 2212859, No. 07-669 (D.N.J. July 31, 2007).

Reaves, President of Omni, was not a credible witness. His answers were evasive, inconsistent and lacked candor. His explanation of why the proposed loan was favorable to Omni made no sense. Reaves testified the proposed transaction was a "balance sheet enhancement," and the underlying benefits to Omni were so obvious and basic that anyone who took "Econ 101" could understand it. In reality, the deal was a very poor one. The deal was laden with extraordinary and non-specific collateral requirements (an amount to far exceed the face amount of the loan ($25 million)), substantial interest payments ($5,625.000), and huge fees to Kennedy ($1,750,000), plus payment of legal fees associated with the transaction. If anything, the deal was not beneficial to Omni. To the Court, the costs exceeded any potential financial benefit to defendant.

Cole, Vice President of Kennedy, also testified. His testimony was more truthful, and straightforward than the other two witnesses.

II.

Kennedy is located in Hackensack, New Jersey. Its primary business is to make loans secured by mortgages on real estate to entities which traditional financial institutions will not consider due to the level of risk involved. Accordingly, Kennedy negotiates higher interest rates and fees to compensate for this risk. Kennedy and its principals are experts within this niche market. Occasionally, Kennedy makes loans secured by other assets (art and boats), but this appears to be on a limited basis. Although Wolfer indicated that he is knowledgeable about all kinds of financing transactions; there is little evidence to support this contention. Kennedy has no formidable experience beyond its niche market – high risk real estate ventures.

Omni is located in Atlanta, Georgia. Its principal business is similar to Kennedy's; but the business appears to have a broader scope in terms of the types of loans it makes. For example,

3

Reaves bragged about financing a championship boxing match which is beyond the scope of Kennedy. In addition to running Omni, Reaves is evidently a well known radio personality in the Atlanta area.

The heart of the dispute revolves around the quality and quantity of collateral to secure the $25 million loan to Omni. Over the course of negotiations (June - December, 2002) there were three different iterations of what the security would be - an insurance guarantee, corporate bonds or United States Treasury Strips (zero coupon funds). Both parties testified that the negotiations were protracted between June and November, 2002. Evidently, negotiations stalled for some period of time, and there were extensive negotiations of the LCA. The parties reviewed and revised approximately eight drafts of the LCA before executing the final version dated November 13, 2002.

The LCA is a six page document plus exhibits. In addition, to those terms aforementioned, the LCA enumerates such items as:

> a. a loan fee of four percent ($1 million) payable to Kennedy (this was in addition to the commitment fees);
> b. the types of agreements that will be executed at closing;
> c. the obligation of borrower to pay all closing costs including Kennedy's legal fees;
> d. a choice of law provision (New Jersey);
> e. a limitation of Kennedy's liability;
> f. a waiver of jury trial; and
> g. numerous boilerplate provisions annexed as an exhibit to the LCA.

The term that is at issue here concerns the collateral to be provided by Omni. In the provision of the LCA entitled "Collateral/Project," it states that Omni shall provide as collateral:

> an irrevocable, unconditional, and transferable Guarantee from an (sic) company having a Best rating of A-, X or better or a Standard & Poor's rating of A or better. (Guarantee) The Guarantee must guarantee payment of the Loan principal, interest, and default interest, late fees, and legal fees in the event of default. The issuer of the

> Guarantee and the Guarantee itself must be in form and substance acceptable to KFI and its counsel in their sole discretion. KFI must be the beneficiary of the Guarantee. (Pltf-12)

The most pertinent fact about this provision is that it lacks a precise dollar amount which must be guaranteed. Instead, it requires that the collateral "guarantee payment of the loan principal, interest, and default interest, late fees and legal fees in the event of default."

Wolfer testified that all guarantees are open ended. According to him, guarantees never have a specific amount because at the time of making, no one knows when default will occur; hence, interest, legal fees and other charges can not be calculated. Wolfer emphasized that it is impossible to know at the time of execution of the LCA what the default interest would be, because the date of default must be known to calculate same (9/10/07, 71:12-16). The same is true with regard to late fees ( 9/10/07, 71:17-19), and legal fees (9/10/07, 71:20-24). To Wolfer, a guarantee necessarily includes the full amount of the loan and attendant costs, without any specific limitation as to such amount. 9/10/07, 71:25-72:6. In Wolfer's view, it was not intended to be for a specific dollar amount (nor could it be) because its purpose is to indemnify Kennedy for all amounts due in the event of a default (9/10/07, 27:2-24; 35:19-36:4; 82:3-23). Those assertions are reasonable in the context of Kennedy's niche market. Often shareholders of a real estate development corporation will be required to guarantee the debt of the corporation in the event of a default in addition to providing a mortgage on the real estate involved. Even in this case, it is reasonable to require Reaves, as the principle of Omni, to execute an open ended guarantee of Omni in the event the primary collateral failed to make Kennedy whole. On the other hand, Wolfer's assertion that Omni could obtain such an open ended guarantee from a "company having a Best rating of A-, x or better, or a Standard and Poor's rating of A or better," as the LCA provides lacks credibility. Such high ratings are conferred

upon substantial and financially sound business entities. The prudent decision-maker of such a highly rated company would not leave an essential term of a guarantee unresolved for the very reasons Wolfer stated above. Common experience suggests otherwise. For example, Omni may have purchased a letter of credit from a financial institution to secure the loan; however, such a financial instrument ordinarily specifies the face amount of the issuer's exposure. There are no opened ended terms. Absent expert testimony, the Court rejects that an open ended guarantee is readily available in the market place. Wolfer's testimony was either untruthful or he simply lacks business acumen.

The same lack of credibility applies to Reaves with regard to this open ended guarantee. Reaves' earliest correspondence to Kennedy indicated he would secure the loan with an "insurance guarantee;" but from June through November of 2002, Omni could not obtain same. Reaves also testified that he continually demanded that Kennedy specify the dollar amount of the guarantee during the negotiations; but, Wolfer would not budge on this issue. Yet, in face of these obstacles, in November, Reaves signed the LCA and forwarded $250,000 in partial satisfaction of the commitment fee. Such a decision is preposterous[2].

Within a week of signing the LCA, it became apparent the guarantee would not work. As a result, Reaves suggested that Omni "hypothecate" corporate bonds as collateral. This was a short lived proposal. There were no more than two telephone conversations among Reaves, Cole and a representative of Synovus Securities (Omni's financial advisor) regarding corporate bonds as

---

[2] Reaves testified Wolfer promised to return the $260,000 if the loan did not close in December, a fact which Wolfer denies. Since it is a practice of Kennedy to charge lucrative commitment fees and retain the money based upon the open ended collateral provision, it is highly unlikely Wolfer made such a representation.

security. It is unclear whether Omni actually submitted a written proposal to Kennedy, detailing the amount and types bonds to be "escrowed" as security.

According to the testimony, the use of corporate bonds would resolve the collateral issue because it would require the parties to agree to a specific dollar value of bonds to be placed as escrow prior to closing (9/11/07, 81:20-25). Recognizing same, Cole nonetheless testified that during these conversations with Reaves regarding corporate bonds, the parties never discussed the precise amount of bonds to be escrowed to secure the loan. Unbelievably, there is nothing in the record which substantially contradicts Cole's recollection - no matter how outlandish this appears to be after months of bickering over the exact issue.

Although not adequately explained, at some point in November, 2002, Reaves abandoned the use of corporate bonds as collateral. Thereafter, Reaves made a last ditch effort on behalf of Omni to satisfy the collateral requirement through the use of zero coupon bonds (U.S. Treasury Strips) as collateral. These discussions commenced several days before the agreed upon "time is of the essence" closing date (December 6, 2002). Omni proposed to provide $21,450,000 of Treasury Strips as collateral. The Treasury Strips would have a value of $25 million at maturity - 5 or 7 years later. Kennedy rejected this proposal out of hand because the Treasury Strips did not meet the collateral requirements of Kennedy. As Cole's notes curtly reflect "25 [million] now worth 22 [million] not 25 [million] until maturity."[3] Why Reaves thought this proposal would be satisfactory to Kennedy is unknown. However, it is equally unreasonable that the parties did not continue to

---

[3] Interestingly, Cole's testimony and notes infer that Kennedy would have accepted a total value of $25 million as collateral. That means Kennedy may have waived interest, late fees and legal fees in the event of default. However, there is no proof that corroborates that such an agreement was reached.

negotiate other terms in light of the substantial collateral offered. For instance, the parties could have reduced the loan amount or supplemented the collateral with other forms of security. As a result of this rejection, the deal was dead. On December 10, 2002, Reaves requested Kennedy return its $250,000 which Wolfer declined to do. Wolfer apparently offered to apply the $250,000 to a future deal.

Reaves also contended that Omni actually purchased $21,450,000 of Treasury Strips in late November, 2002 for use as collateral, in order to close the loan on December 6, 2002. Reaves testified that he informed Wolfer of the CUSIP numbers which appear on the Treasury Strips purchased. The CUSIP numbers evidently allow investors to track and/or identify ownership of such Treasury Strips. Reaves contends this proves that he actually purchased them. This testimony is not believable for two reasons. First, the best evidence of purchase of the Treasury Strips is a written document in the form of a confirmation of purchase. It has not been produced. Second, the testimony is inconsistent (9/11/07, 15:14-25; 16:1-25). Reaves initially testified Synovus purchased the bonds on Omni's behalf; but later in his testimony, when he was shown documents which suggested otherwise, Reaves recanted and stated he purchased them on-line. As a result, the Court finds that there is lack of credible evidence to support Reaves testimony that Omni had actually purchased the Treasury Strips.

Wolfer testified that if Omni had provided Kennedy with any viable collateral proposal, it would have determined the adequacy of such a proposal based upon the industry standard of reasonableness. This testimony is self serving and not credible. Wolfer never adequately defined what is meant by the industry standard of reasonableness, and once Kennedy received partial payment of the commitment fee, it did little, if anything, to close the loan. For example, Wolfer

admits Kennedy never established a precise dollar amount which would satisfy the collateral provision of the LCA. Wolfer shrugged off the notion that Kennedy had any obligation to do so. He stated that it was Omni's job to know the amount of collateral, not Kennedy's, because Omni was providing the collateral. Such a conclusion makes little sense. Once the LCA was signed, there was a mutual obligation to resolve this issue. Kennedy never attempted to resolve any issues in order to close. Similarly, in the interim period between execution of LCA and the proposed "time is of the essence" closing date, Kennedy participated in no more than four telephone conversations with Omni regarding the transaction; and Kennedy's role in those calls was limited to deflecting Omni's collateral proposals and rejecting them with little explanation. The record is void of any evidence that Kennedy undertook any measures to close the loan. For example, the LCA requires that closing documents be drafted in time for closing; but there is no evidence that Kennedy's lawyer began this task. In addition, the LCA states that Kennedy was to find other participants with whom it would share Kennedy's risk. There is no evidence that Kennedy ever contacted any "would be" participants. Since Kennedy did not take any reasonable steps to close the loan, Wolfer's suggestion that Kennedy would employ a reasonableness test is simply not credible. The more credible conclusion is that Kennedy was content to retain the partial commitment fee ($260,000) without exerting any effort.

III.

Reaves argues that the LCA is illusory and therefore unenforceable as a matter of law. Generally, a promise is illusory when it fails to bind the promisor. However, Courts avoid determining that a contract is illusory where possible. A contract that provides a party with discretion, or that is conditional in some way, is not illusory, unless it makes performance <u>entirely</u> optional on the part of the promisor. *See Bryant v. City of Atlantic City*, 707 A.2d 1072, 1085 (N.J.

9

App. Div. 1998). An illusory promise is "[a]n apparent promise, which according to its terms makes performance optional whatever may happen, or whatever course of conduct in other respects he may pursue, is in fact no promise . . . " *Curtis Elevator Co. v. Hampshire House Inc.*, 362 A.2d 73, (Law Div. 1976). "Thus, if performance of an apparent promise is entirely optional with a promisor, the promise is deemed illusory." *See*, *Bryant*, 707 A.2d at 1085; *Del Sontro v. Cendant Corp., Inc.*, 223 F. Supp. 2d 563, 578 (D.N.J. 2002).

The plaintiff argues that the provision concerning collateral within the LCA meets this standard because the "guarantee itself [had to] be in form and substance acceptable to [Kennedy] and its counsel in their sole discretion. At least one New Jersey Court has found same. *National Integrity Development, Inc. v. Kennedy Funding, Superior Court of New Jersey, Law Division, BER-L-10489-97) (Feb. 2001).* In *National Integrity*, the identical provision as in controversy here was deemed unenforcement because it was illusory. In his opinion, now Retired Judge Martin J. Kole wrote:

> Under this provision, the Loan Commitment is entirely illusory. KFI made no binding promise to [the borrower]; it did not assume any genuine duty to perform; it did not incur any liability to [the borrower]; and it made no promise capable of forming a contract. KFI's "commitment" was left entirely to its own discretion and KFI was empowered to cancel the loan even if the borrower fully and completely performed.

Despite Judge Kole's opinion, at least two District Court cases have found the same provision not to be illusory as a matter of law. *Kennedy, Inc. v. Lion's Gate Development*, 2006 WL 2786927 (D.N.J. September 26, 2006)*; Kennedy, Inc. v. Ruggers Acquisition*, United States District Court of New Jersey Case No. 07-669 (D.N.J. July 31, 2007). Generally, a promise is not considered illusory even if some discretion to cancel is maintained by a party. *See, Watson v. Salem*, 934 F. Supp. 643

(D.N.J. 1995); *State Farm v. Anderson*, 176 A. 2d 23, 27 (N.J. App. Div. 1961). In *Lion's Gate*, Judge Debevoise, keeping with the policy to avoid deeming a contract illusory, found:

> The parties in this matter entered into the Loan Commitment and were bound by the terms therein. Although the terms establish certain requirements that must be complied with, they do not make performance on the part of KFI entirely optional.... Additionally, if KFI was unable to perform, it was obligated to refund the commitment fee. Finally, KFI was bound by the implied covenant of good faith and fair dealing. This obligation, by itself, is enough to avoid the finding of an illusory promise. Thus, the Loan Commitment is not illusory as a matter of law. *Lion's Gate*, 2006 WL 2786927 at *3.

Similarly, Judge Hochberg similarly noted that "[a] lender may retain discretion to cancel the agreement for good faith reasons, including dissatisfaction of certain conditions precedent." *Kennedy Funding v. Ruggers Acquisition*, 2007 WL 2212859 at *5 . The rationale of *Lion's Gate* and *Rugger's Acquisition* is persuasive. The collateral provision as written is enforceable because it is subject to the implied covenant of good faith and fair dealing which exists in every contract. *Lion's Gate*, *supra*, at *3. *See, U.S. v. Isaac*, 141 F. 3d 477, 482 (3d Cir. 1998). In addition, an open ended personal guarantee of Reaves may have been a perfectly acceptable form of guarantee under the circumstances. What is unreasonable is the notion that a corporation or financial institution with a very high rating from Best's or Standard & Poor would provide an open ended guarantee.

IV.

Omni next argues that Kennedy breached the implied covenant of good faith and fair dealing. The Court finds that both Omni and Kennedy breached this implied covenant. "Every contract in New Jersey contains an implied covenant of good faith and fair dealing." *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997). The implied covenant directs that "neither party shall

do anything which will have the effect of destroying or injuring the right of the other party to receive fruits of the contract . . . ". *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126-27 (N.J. 2001) (citing *Sons of Thunder*, 690 A.2d at 587). In short, the implied covenant of good faith and fair dealing "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Wilson*, 773 A.2d at 1126-27 (quoting *Restatement (Second) of Contracts*, § 205, comment a (1981)).

The Supreme Court of New Jersey observed that the term "good faith" requires honesty in fact between the parties to a contract. The Court wrote:

> Good faith conduct is conduct that does not violate community standards of decency, fairness or reasonableness. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing anything that will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.
> Proof of bad motive or intention is vital to an action for breach of the covenant. The party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties. As a general rule, subterfuges and evasions in the performance of a contract violate the covenant of good faith and fair dealing even though the actor believes his conduct to be justified. *Brunswick v. Route 18 Shop. Center*, 182 N.J.210 (2005).

In applying that standard to this case, the Court finds that Kennedy and Omni breached community standards of "fairness and reasonableness" and engaged in "subterfuges and evasions."

Through Wolfer and Cole, Kennedy violated the implied covenant in at least two ways:

First it was totally unreasonable to require Omni to acquire an open ended guarantee from a corporation having a "Standard & Poor's rating of A or better."  To make this contract work, Kennedy knew some alternative form of collateral would be required.  Secondly, after executing the LCA and receiving $250,000 in part payment of a commitment fee, there was an affirmative duty upon Kennedy to attempt to negotiate a deal in good faith.  To sit back, as Kennedy did, rather than affirmatively attempting to resolve collateral issues had the "effect of destroying" Omni's rights.  This was either the result of absolute unreasonableness, or part of a deliberate scheme of Kennedy to ensure that Omni could not meet the collateral requirements so that it could retain the partial commitment fee.

Similar to Kennedy, Omni lacked candor.  Notably, Reaves, by his own testimony, admits that he attempted to lure Kennedy into closing by representing to Kennedy that Omni had purchased $21,465,000 in Treasury Strips in late November when in fact Omni had not done so.  Moreover, Reaves' testimony that he informed Kennedy of the CUSIP numbers and this constitutes proof of purchase of Treasury Strips is farfetched.

The point is neither party was acting forthrightly. Both parties were trying to scam the other. The Court finds that both parties breached the covenant of good faith and fair dealing.

V.

Having found that both parties have breached the covenant of good faith and fair dealing and lack credibility, the query is what is the most appropriate remedy under the circumstances.

With regard to Kennedy's counter-claim that the remainder of the commitment fee ($500,000.00) is due, the answer is obvious. As noted above, subsequent to the execution of the LCA, Kennedy did nothing to prepare for closing on December 6, 2002, and there is no proof that

it incurred any expenses or suffered any damages as a result of the failure to close. Accordingly, the Court finds Kennedy did nothing to justify payment of the balance of the commitment fee. The counterclaim is dismissed with prejudice.

Since Omni also breached the implied covenant and did not provide credible evidence to support its claim, the claims within the Complaint are dismissed with prejudice, except as explained below. The issue which remains is what happens to the $250,000. The Court finds that both parties were engaging in subterfuge and chicanery. This Court finds based on the testimony of both Reaves and Wolfer that each party had entered the LCA in bad faith. As a consequence, this Court rescinds the LCA since both parties were in material breach. Under the circumstances, the best equitable solution is to put the parties back in the same position as they were prior to entering the LCA[4]. *Farris v. County of Camden*, 61 F.Supp.2d 307, 336 (D.N.J.1999); See 49 N.J. Prac., Business Law Deskbook §7:42 (2007 ed.); *Center 48 Ltd. Partnership v. May Dept., Stores Co.*, 810 A.2d 610, 623 (App. Div. 2005). Accordingly, Kennedy must return the money. Judgment against Kennedy in the amount of $250,000 is entered without interest, legal fees or costs.

*s/ Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

December 11, 2007

---

[4] The ad damnum clause within the Complaint invokes the Court's equitable powers. This is sufficient basis upon which to issue equitable relief.